Willcox *v.* Penn Mutual Life Insurance Co.

Argued November 10, 1947. Before MAXEY, C. J., LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Philip A. Bregy,* with him *MacCoy, Brittain, Evans & Lewis,* for plaintiff.

*Robert Dechert,* with him *George Wharton Pepper, C. Clothier Jones, Jr., R. Stewart Rauch, Jr., Warner F. Haldeman* and *Barnes, Dechert, Price, Smith & Clark,* for defendant.

*Anderson Page,* with him *Saul, Ewing, Remick & Saul,* for Mary F. W. Lewis, intervenor.

*T. McKeen Chidsey,* Attorney General, with him *Ralph B. Umsted, Samuel M. Jackson* and *Harrington Adams,* Deputy Attorneys General, for Commonwealth, intervenor.

· *Thomas Raeburn White,* with him *Bernard V. Lentz, C. Laurence Cushmore, Jr.,* and *John W. Lord, Jr.,* amici curiæ.

*Stephen T. Dean, William J. Duiker, Robert T. Mc-Cracken* and *Montgomery, McCracken, Walker & Rhoads,* amici curiæ.

OPINION BY MR. JUSTICE HORACE STERN, November 26, 1947:

This litigation, of which we took original jurisdiction, involves questions of the interpretation and validity of the Community Property Law of 1947 (Act No. 550). We approach the solution of the problems presented with a realization of the fact that this law vitally affects the respective property rights, and through them the conjugal relationship, of all married persons within the Commonwealth of Pennsylvania. Nor are we unmindful of the principle ingrained in American jurisprudence that a proper respect for the legislative and executive departments of the government requires that every reasonable presumption be made in favor of the validity of a statute, and that, before an act may be declared unconstitutional or otherwise invalid, it must clearly appear that it cannot be supported by any reasonable intendment.

The Community Property Law provides that all property of the husband owned by him before marriage, or before the effective date of the act (September 1, 1947), whichever is later, and that acquired afterwards by gift, devise or descent, or received as compensation for personal injuries, shall be his separate property. A similar provision is made in respect to the separate property of the wife. All property acquired by either the husband or wife during marriage and after the effective date of the act, except that which is the separate property of either, is to be "deemed the community or common property of the husband and wife, and each shall be vested with an undivided one-half interest therein". The wife is to have the management and control and may dispose of her separate property "and that portion of the common or community property, consisting of her earnings, all rents, interest, dividends and other income from her separate property and all other common or community property, the title to which stands in her name. The husband shall have the management and control and may dispose of his separate property and all community property, the management, control, disposition of which is not conferred upon the wife hereby." (All real estate, however, whether separate or community property, shall not be disposed of or encumbered "except in the manner provided by law prior to the effective date" of the act). In the event of a divorce the husband and wife "shall each be vested with an undivided one-half interest in the community property, as tenants in common, but nothing herein shall prevent the court from having the same powers with respect to said property as to other property of either the husband or wife." Upon the death of the husband or the wife "the surviving spouse shall administer all community property in the same manner and with the same duties, privileges and authority as are vested in a surviving partner to administer and settle the affairs of a partnership upon the death of the other partner." After

paying out of the community property all debts of the community the survivor is to "transfer and convey to the administrator or executor of the deceased one-half of the community property remaining to be administered and distributed as other property of the estate."

Such being the essential features of the act, the case now presented is this: Plaintiff, Mark Willcox, Jr., brings a bill in equity against The Penn Mutual Life Insurance Company, in which he alleges that Shippen Lewis held a life insurance policy of the Company, issued to him in 1934, the proceeds payable on his death to his children and their issue, with the right on his part to change the beneficiaries, to borrow on the policy, and to assign it to another. At the time this policy was issued he was married to Mary F. W. Lewis and this marriage is still in effect. On October 1, 1947 he paid in advance an annual premium in the amount of $96.11 which was made up of money derived from three sources, of which fact he notified the Company at the time of the payment. $24 thereof had been obtained by him on September 30, 1947 as life tenant of a trust created many years previously under the will of his grandfather. $42 of the premium was paid by endorsing to the Company a check which he had received on September 30, 1947 as a dividend on stock of the American Brake Shoe Company owned by him since 1943. The balance, $30.11, was paid in cash which he had owned prior to September 1, 1947. After paying this premium, Mr. Lewis, on October 1, 1947, assigned all his rights under the policy to plaintiff, without receiving any consideration therefor. Plaintiff then applied to the Company for the issuance of a paid-up policy based on the cash surrender value of the assigned policy, and for a loan of $500. Admittedly, if the assignment was valid, he was entitled to have these requests granted, but the Company refused to comply unless Mrs. Lewis agreed, its position being that, since it had been notified that parts of the premium payment apparently consisted of

community property of Mr. Lewis and his wife, the latter had a legal interest in the value of the policy which limited his right to assign it without her consent. Plaintiff seeks a mandatory injunction directing the Company to issue to him the paid-up policy and to grant him the loan. The Company filed an answer admitting the facts, and, in effect, submitting itself to the order of the court. Mrs. Lewis has intervened by counsel, as has also the Commonwealth of Pennsylvania by the Attorney General; eminent counsel have filed briefs as amici curiæ. It may be proper to add that the suit is obviously a friendly one among all the parties and that the transactions involved were entered into only for the purpose of obtaining a judicial interpretation of the statute and a decision as to its validity.

It may be stated at the outset that the manifold intricacies of the problems here involved arise largely by reason of the fact that the Community Property Law emanates, in its fundamental concepts, from Spanish sources, and the present attempt to engraft it upon our own system necessarily results in fundamental conflicts with principles of the common law centuries old. The community or "ganancial" system was introduced by the Visigothic invaders of the Roman Empire in the early part of the fifth century into what is now Spain and portions of France; it was never, however, permanently adopted in Normandy and for that reason did not become fastened upon English law by the Norman conquest. It was brought into the parts of America settled by the French and Spanish colonists and thus came to be enshrined in the law of Louisiana and of the states carved out of the territory obtained as a result of the Mexican war; as to Louisiana it was imbedded to some extent in the Code Napoleon.

From what has been said it is obvious that the Community Property Law is exotic with respect to both our substantive and procedural law. It represents "a concept of property that is entirely alien and foreign

to that of the common law as to the conjugal relationship and the marital rights in property": de Funiak, Principles of Community Property, vol. 1, p. 4, §2. It is "radically at variance with the principles of the common law, and . . . utterly devoid of analogies with that system of jurisprudence": Ballinger on the Property Rights of Husband and Wife under the Community or Ganancial System, p. 3, §1. Its construction under Spanish law naturally proceeds in harmony with the Spanish codes and the commentaries of the Spanish jurisconsults, whereas its interpretation in accordance with "that codeless myriad of precedent" which constitutes our own common law necessarily gives rise to a welter of confusion and a hybrid jurisprudence. And yet common law principles cannot be ignored nor antagonistic concepts of Spanish law be adopted by the courts of this Commonwealth.

It scarcely needs to be stated that the court is not concerned with the wisdom of this new act. The judiciary deals only with the legislative power to enact a statute, with the proper interpretation of the statute as enacted, and with the question whether it is judicially enforceable. What the present case involves, therefore, is the duty of determining whether, under the provisions of this act, two of the portions used to pay the annual premium on Mr. Lewis's policy were community property a one-half interest in which belonged to his wife, —namely, the portion derived from a dividend received by him after the effective date of the act but on stock owned by him prior thereto, and the portion received by him after the effective date of the act as life tenant under a previously created trust. If it be decided that these items did constitute community property under the statute there then arises the more serious question as to whether the Community Property Law is a valid legislative act.

Under the Spanish law the fruits and profits of the separate property owned by each spouse at the time

of marriage become community property belonging to both spouses by halves: de Funiak, vol. 1, p. 180, §71. That principle is followed in the constitutions, statutes or judicial decisions of some of the community property States, such as Idaho, Louisiana and Texas, but others of such States—Arizona, California, Nevada, New Mexico and Washington—have, either by statutory enactments or judicial interpretations, provided that the income accruing after the marriage from such separate property shall also be separate property. In order to arrive, therefore, at a proper construction of our own statute we are not aided by these differences of viewpoint in the laws and policies of the community property States, but must construe independently the provision, unfortunately inadequate and obscure, of the Pennsylvania act.

Sections 1 and 2 of the Community Property Law state that the separate property of the husband and wife respectively shall consist of all property owned by him or her before marriage or before the effective date of the act, whichever is later, and that acquired afterwards by gift, devise or descent. Section 3 provides that all property acquired by either the husband or wife during marriage and after the effective date of the act, except that which is the separate property of either, shall be deemed the community or common property of the husband and wife; in other words, everything which is not separate property under sections 1 and 2 is community property under section 3. The question then arises whether, under the first two sections, "all property of the husband [wife] . . . owned . . . by him [her] before marriage" does or does not include the income from such property accruing after the marriage. The answer to this question would seem to be indicated by section 4 of the act which provides that the wife shall have the management, control and disposition of her separate property and also of "that portion of the common or community property, consisting of her earnings,

all rents, interest, dividends and other income from her separate property and all other common or community property, the title to which stands in her name." From this it would appear that the legislature intended that not only the wife's earnings but "all rents, interest, dividends and other income from her separate property" should constitute a "portion of the common or community property", an inference strengthened by the phrase "all *other* common or community property, the title to which stands in her name". Of course, whatever is true in this respect of the wife's income from her separate property must apply similarly to the income of the husband from his separate property. It therefore seems reasonably conclusive that income accruing to either spouse during the marriage and after the effective date of the act, and arising out of property owned by such spouse prior to the marriage or to such date, becomes community property of which one-half belongs to each. This view takes on added force from the fact that if such income does *not* become community property the avowed purpose of the statute to reduce the amount of federal income taxes payable by married persons in Pennsylvania would be largely frustrated since it is obvious that if only their earnings, and not their income from pre-existing investments, is to constitute community property, the result in a large number of instances would be an increase rather than a diminution of such taxes.

We fail to perceive any difference, with regard to this question, between the item of $42 which Mr. Lewis received as a dividend after, but on stock owned by him before, the effective date of the act, and the item of $24 which represented income also received by him after that date as life tenant of a trust long previously created. His interest in that trust was an equitable right in rem (*Commonwealth v. Stewart*, 338 Pa. 9, 12 A. 2d 444), and any income received therefrom became community property under the statute: *Commissioner of*

*Internal Revenue v. Terry,* 69 F. 2d 969; *Commissioner of Internal Revenue v. Wilson,* 76 F. 2d 766. This is so even though the trust was a spendthrift one: *Commissioner of Internal Revenue v. Porter,* 148 F. 2d 566; *Commissioner of Internal Revenue v. Snowden,* 148 F. 2d 569.

Assuming, then, that the statute actually vests each spouse with a one-half share in such community property, we are met with the question: What is the constitutional power of the legislature to accomplish such an involuntary transfer of property in the case of marriages existing before the effective date of the act? The very first section of the first article of the Declaration of Rights of the Constitution of Pennsylvania provides that "All men . . . have certain inherent and indefeasible rights, among which are those . . . of acquiring, possessing and protecting property". This amounts substantially to the provision contained in the 14th Amendment to the Federal Constitution, that no State shall "deprive any person . . . of property, without due process of law". Nearly a hundred years ago it was said by this court in *Ervine's Appeal,* 16 Pa. 256, 263, 264, that "If the legislature possessed an irresponsible power over every man's private estate . . . all inducement to acquisition, to industry and economy would be removed. . . . If the government is interdicted from taking private property even for public use without just compensation, how can the legislature take it from one man and dispose of it as they think fit. The great principle is, that a man's property is his own, and that he shall enjoy it according to his pleasure (injuring no other man) until it is proved in a due process of law that it is not his, but belongs to another." In *Palairet's Appeal,* 67 Pa. 479, 485, 486, Mr. Justice (later Chief Justice) SHARSWOOD said: "If . . . an Act of Assembly . . . operates retroactively to take what is, by existing law, the property of one man, and, without his consent, transfer it to another, with or without com-

pensation, it is in violation of that clause in the Bill of Rights, Const., Art. IX, sect. 9, which declares that no man 'can be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land.' If this is true of a person accused of crime, to whom literally the words are applied, *a fortiori* is it so as to one against whom no accusation is made. By the 'law of the land', is meant, not the arbitrary edict of any body of men—not an Act of Assembly, though it may have all the outward form of a law—but due process of law . . . If this be not so, every restriction upon legislative authority would be a vain formula of words, without life or force. . . . It has become, then, a fundamental axiom of constitutional law . . . that the legislative power cannot either directly or indirectly, without the consent of the owner, take private property for merely private use, with or without compensation." In *Durkin v. Kingston Coal Co.,* 171 Pa. 193, 199, 33 A. 237, it was declared that "A statute . . . that should take the property of one person and give it to another, or to the public without making just compensation therefor, would violate the bill of rights, and would be for that reason unconstitutional and void." And in *E. T. Fraim Lock Co. v. Shimer,* 43 Pa. Superior Ct. 221, 224, it was said that "An act of assembly which operates retrospectively to take the property of John Doe and give it to Richard Roe, is prohibited by the fundamental law." It is clear, then, that had the legislature attempted by the Community Property Law to transform property then owned by either spouse from separate into community property, such a provision could not have stood the test of constitutionality. But how is the situation different merely because, instead of a provision of that nature, the act communizes the future *income* from such property? Of what value is it to an owner to be allowed to retain what would virtually be a mere nominal ownership, if he is compelled to surrender the profits and income therefrom? It is one of

the classic utterances of the law that "if a man seised of lands in fee by his deed granteth to another the profit of those lands, . . . the whole land itselfe doth passe; for what is the land but the profits thereof.": Co. Litt. 4 b.

It is argued that while, as stated in *E. T. Fraim Lock Co. v. Shimer,* supra, an act of assembly cannot take the property of John Doe and give it to Richard Roe, it *can* take the property of John Doe and give it to *Mrs.* John Doe, on the theory that the legislature has the power to regulate and control the property rights of husband and wife inter se, unrestricted by our Declaration of Rights or the 14th Amendment. In support of this contention there is quoted the pronouncement of Mr. Justice FIELD in *Maynard v. Hill,* 125 U. S. 190, to the effect that "Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, *its effects upon the property rights of both, present and prospective,* and the acts which may constitute grounds for its dissolution." But the generality of this statement is subject to drastic limitation, for it is more correct to state the principle as it is laid down by Mr. Justice HARLAN in *Baker's Executors v. Kilgore,* 145 U. S. 487, 491: "The relation of husband and wife is . . . formed subject to the power of the State to control and regulate both that relation and the property rights *directly connected with it,* by such legislation *as does not violate those fundamental principles which have been established for the protection of private and personal rights against illegal interference."* Or, as was said in *Scaife v. McKee,* 298 Pa. 33, 39, 148 A. 37, 39, "property rights . . . *arising solely by reason of the marriage,* are within legislative control". While the

legislature may have power to alter and control the rights of curtesy and dower, since such rights *arise whilly out of the marriage relation itself (Melizet's Appeal,* 17 Pa. 449; *Scaife v. McKee,* supra) it cannot transfer from one spouse to the other a property right *which existed before, and entirely independently of, the marriage: Elder v. Elder,* 256 Pa. 139, 100 A. 581. Of course, it may provide for the distribution of every person's property at death and to some extent the property of a married person in the event of divorce; it may also compel the application of a sufficient portion of the husband's property to the support and maintenance of his wife; furthermore, it is not contended that the legislature may not establish a common ownership of the *earnings* of the husband and wife accruing in the future, it being recognized that, while the husband is usually the breadwinner, the wife, by her management of the household and rearing of the children, makes it possible for the husband to devote himself more freely to his income-producing activities; this justifies the pooling of their resources thus derived from what is essentially a common enterprise; (cf. Act of June 3, 1887, P. L. 332; *Lewis's Estate. Rhodes's Appeal,* 156 Pa. 337, 27 A. 35; *Nuding and Schlouch v. Urich,* 169 Pa. 289, 32 A. 409). But as to the income and profits derived from property, real or personal, owned by a spouse prior to the effective date of the Community Property Law, the act, in making such income and profits the common property of both spouses, is unconstitutional. Parenthetically it may be noted that in those States whose *constitutions* provide for the community property system, or where, from the very beginning of their governmental existence, the community property system was an integral part of their law, the situation is, of course, entirely different.

According to the Statutory Construction Act of May 28, 1937, P. L. 1019, §55, "If any provision of a law is found by a court of record to be unconstitutional and void, the remaining provisions of the law shall,

nevertheless, remain valid, unless the court finds the valid provisions of the law are so essentially and inseparably connected with, and so depend upon, the void provision, that it cannot be presumed the Legislature would have enacted the remaining valid provisions without the void one; or unless the court finds the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." This was a well known canon of statutory construction long before the passage of the Statutory Construction Act; it applies even where the statute itself declares, as a legislative intent, that the act would have been adopted even if a particular part of it should be held unconstitutional: *Kelley v. Kalodner,* 320 Pa. 180, 188, 181 A. 598, 601. The present Community Property Law does not contain such a provision nor any clause of severability; this greatly strengthens our conclusion that the legislature would not have enacted this law had it known that community property, in the case of existing marriages, would necessarily be confined to the future earnings of the husband and wife and could not constitutionally include the income from their separate property, for, when the law is thus limited, the result in many cases will be that the combined federal income taxes to be paid by both spouses will be increased instead of being reduced, a result which could not be avoided by either spouse taking advantage of the right granted in section 9 of the act to convey to the other his or her community property *in esse;* that privilege is limited to conveyances of income *after* it has been received and does not extend to assignments of future income, but even if such latter assignments were expressly permitted they would be ineffectual for the accomplishment of tax savings: *Lucas, Commissioner of Internal Revenue, v. Earl,* 281 U. S. 111; *Commissioner of Internal Revenue v. Harmon,* 323 U. S. 44; (cf. *Frame v. Frame,* 120 Tex. 61, 36 S.W. 2d 152, 155). It being a matter of common knowledge, asserted

both by the author of the act and by the Governor in a message accompanying its approval, that the object of the enactment was to lessen income taxes and thereby save—in that sense—large sums of money to the married citizens of the Commonwealth, it seems reasonable to assume that the statute would not have been enacted by the legislature or approved by the executive if the desired objective could not, within constitutional limits, be generally attained. The act is therefore invalid as an entirety.

We have thus far been discussing the constitutionality of the Community Property Law on the assumption that it effects an actual transfer of an interest in property from one spouse to another. But when the act is more closely studied in regard to such alleged transfer it appears that the statute is in fact so uncertain and contradictory in its terms concerning that vital subject as to be, in any event, inoperative and incapable of execution. "Where a statute is 'so vague, indefinite and uncertain that the courts are unable to determine, with any reasonable degree of certainty, what the legislature intended, or is so incomplete or conflicting and inconsistent in its provisions that it cannot be executed, it will be declared inoperative.' ": *Miller v. Belmont Packing & Rubber Co.*, 268 Pa. 51, 63, 110 A. 802, 806. The Community Property Law proclaims that property acquired by either spouse during marriage and after the effective date of the act, except that which is the separate property of either, shall be deemed the community or common property of the husband and wife, and each shall be vested with an undivided one-half interest therein. Practically all the remaining provisions, however, would seem to be in conflict with this pronouncement, with the apparent result that each spouse is not in reality given an undivided one-half interest in the so-called community or common property. For what is meant by the ownership of property? According to common law concepts property is "the right of any

person to *possess, use, enjoy and dispose* of a thing.":
*Wynehamer v. The People,* 13 N.Y. 378, 433. It "is composed of certain constituent elements, to-wit: The unrestricted right of *use, enjoyment and disposal,* of that object.": *City of St. Louis v. Hill,* 116 Mo. 527, 533, 22 S.W. 861, 862. Is the wife, or the husband as the case may be, invested by the Community Property Law with any real right to the possession, use, enjoyment and disposal of the alleged community property in which she or he is said to be given a one-half interest? An analysis of some of the provisions of the act will show that that question must be answered in the negative.

1. Section 4 of the statute gives to the husband (similarly to the wife) the management and control of all the community property of which he would have remained the unrestricted and exclusive owner as theretofore had the Community Property Law not been enacted. The wife cannot interfere with such control or management, not only because, as hereinafter pointed out, she cannot, as long as the marriage relation continues, obtain legal relief against her husband no matter what he may choose to do with such community property, but also because the statute by its terms does not limit in the slightest degree the extent of the husband's right of management and control. It is true that under Spanish law the husband's administration of the community property must be directed to the preservation and use of it for the common benefit of himself and his wife and may not be exercised to the latter's prejudice. But the generality of the Pennsylvania act does not admit of the adoption of such a qualified construction if common law principles of interpretation are to be applied. The marital community which it establishes cannot be assimilated to the status of a unified entity, a tenancy by the entireties, a joint tenancy, a tenancy in common, a partnership, or a trust or agency relationship, for, if any of those conceptions were to be fastened upon the statute, it would mean that neither spouse could act with regard to the

community property in nearly any of the ordinary affairs and transactions of life without accounting to the other for his or her half interest, a result which the legislature certainly did not intend and which would be wholly impractical and incapable of enforcement. It is clear, therefore, that as far as this particular test of ownership is concerned—the right of the owner to possess, use and enjoy a thing—the wife is not given by the act any real interest in the community property under her husband's management and control. It was said in *George v. Ransom,* 15 Cal. 322, 324: "The common law recognizes no such solecism as a right in the wife to the estate, and a right in some one else to use it as he pleased, and to enjoy all the advantages of its use. It is not perceived that property can be in one, in full and separate ownership, with a right in another to control it, and enjoy all of its benefits. The sole value of property is in its use; to dissociate the right of property from the use in this class of cases, would be to preserve the name—the mere shadow—and destroy the thing itself—the substance. . . . This could no more be done, in consistency with our ideas of property, during the lifetime of the wife, than for all time."

2. An even more glaring lack of the incidents of ownership exists by reason of the power given to the husband (or wife, as the case may be) to *dispose* of community property. Some of the community property States limit that power more or less drastically by constitutional or statutory provisions; others have wrestled with the problem it presents by a multitude of judicial decisions which not only vary among the different States but are sometimes contradictory even within the same State. The Pennsylvania Community Property Law itself contains no express limitation and furnishes no indication of any standard or guide as to the extent of this power of disposition of community property by either spouse. Has the husband the right to make gifts of the community property derived from his earnings

or the income from his separate property? Some of the community property States deny him any such right, others concede it to him at least as far as personalty is concerned, while still others, by what would seem to be more or less arbitrary judicial interpolations in the statutes, allow him to make gifts which are not, *in the opinion of the court,* excessive in proportion to the total amount of the community property, or not in "fraud" of his wife, or not for a purpose obviously hostile to the conjugal relation. Nor is the problem arising from the inherent vagueness of the act in this respect confined to the matter of gifts. Is the husband to be permitted to expend community property in the indulgence of extravagant tastes of his own, as, for example, for extensive pleasure trips, or the purchase of jewelry or other luxuries, or in the pursuit of gambling? May he use community property without his wife's consent in order, as in the present case, to pay a premium on a life insurance policy for the benefit of a third person, and would it make any difference in that connection if the beneficiary named were one of his own relatives, or perhaps some one actually distasteful to his wife? Might he so much, indeed, as buy a cigar or a newspaper with money one-half of which belonged to his wife without at least the *technical* duty of accounting to her for her portion of the money thus expended? These illustrations of elementary transactions which occur more or less in everyday life, fanciful or even humorous as they may appear, (and indicative, perhaps, of a possibility that the Community Property Law might serve to increase marital discord rather than promote marital harmony), are here advanced solely for the purpose of emphasizing the fact that this statute offers no semblance of a light for the courts to follow in adjudicating such problems and in attempting to provide a pattern for the life of citizens thereunder. Such vagueness in a statute which deals with property rights is, in itself, fatal. Moreover, if (as we would be bound to

hold in the absence of any express limitations on the power of disposition of community property) that power is unrestricted in the case of the earnings and the income from the separate property of the respective spouses (cf. *Garrozi v. Dastas,* 204 U. S. 64, 78, 79; *U. S. v. Robbins,* 269 U.S. 315, 327) it is so inconsistent with, and contradictory to, the nominal grant of vested interests in the community property as to make the very term "community property" an obvious misnomer and to render the act itself incapable of being executed.

3. Not only does each spouse, as has thus been shown, have the power to defeat the illusory title and interest given to the other spouse, but section 7 of the act provides that "That portion of the community property under the management, control and disposition of the wife, or which stands in her name, shall be liable for debts contracted by the wife and for torts of the wife committed in the course of acquiring, holding or managing such community property, but not otherwise." There is a corresponding provision in regard to debts contracted by the husband. We have here another instance of the somewhat clumsy phrasing which appears in several portions of the act; apparently, however, this provision is intended to mean that the portion of the community property consisting of the husband's [wife's] earnings, the income from his [her] separate property, and the property the title to which is in his [her] name, is liable for his [her] individual debts. Thus not only can the husband defeat his wife's interest in such property by directly disposing of it, but the same result would ensue from his contracting debts and allowing his creditors to sweep away such alleged community property. It may be added that in the Spanish community property system debts contracted by a spouse in a matter not concerning the conjugal relation and not for its benefit are not payable out of the community property.

4. Finally,—and this also constitutes an important difference from the Spanish law, under which, dating back hundreds of years and still followed by the modern civil codes of Spain, any violation of the husband's duties in regard to administration, control and disposition of the communal property gives rise to remedial relief in favor of the wife—under our own statutory law (Act of June 8, 1893, P. L. 344, amended by the Act of March 27, 1913, P. L. 14) neither a husband nor a wife may sue his or her spouse, except in a proceeding for divorce, or "to protect or recover his [her] *separate* property." The Community Property Law distinguishes sharply between separate and community property. Even if, therefore, a wife in Pennsylvania did have any actual, vested interest in the community property over which her husband had the power of disposition and which was subject to the rights of his creditors, she would not have any right of redress or appeal to the courts as long as the marriage existed, no matter what predatory and illegal acts he might commit with respect to such property; (cf. *Stimson v. Stimson,* 346 Pa. 68, 73, 29 A. 2d 679, 682; *Wakefield v. Wakefield,* 149 Pa. Superior Ct. 9, 25 A. 2d 841). Only after dissolution of the marital relation, either by divorce or death, can the wrongdoing husband or his estate be brought to some measure of account, so that there is ample justification for the paradox mentioned by Mr. Justice HOLMES in *Arnett v. Reade,* 220 U. S. 311, 319, that "community is a partnership which begins only at its end." All that the wife has, while the marriage continues, is a mere expectancy or hope to receive a moiety of the assets that may happen to exist when the marriage is terminated. This lack of an efficient legal remedy is, in effect, the negation of a legal right. Not only is the maxim *"ubi jus ibi remedium"*—where there is a right there is a remedy—one of the proudest declarations of the common law, but it necessarily implies that a right without a remedy is not a right at all but a mere ab-

straction. It was said by HOLT, C. J., in *Ashby v. White,* 2 Ld. Raym. 938, 953, that "it is a vain thing to imagine a right without a remedy; for want of right and want of remedy are reciprocal."

Summarizing, then, what has thus been set forth, it is obvious that an alleged interest in property over which another person has the right of control, management and disposal, which the creditors of such other person can take in satisfaction of his debts, and as to which there is no practical means of protection, is not a genuine right of property no matter what name or alleged title of ownership may have been given it. It follows, therefore, that the Community Property Law is not only "vague, indefinite and uncertain" but so "incomplete, conflicting and inconsistent in its provisions" that it is incapable either of rational interpretation or of judicial enforcement and consequently, under the principle previously referred to, it must be held to be inoperative and void. It is true that in *Poe, Collector of Internal Revenue, v. Seaborn,* 282 U. S. 101, and companion cases (*Goodell, Collector of Internal Revenue, v. Koch,* 282 U. S. 118; *Hopkins, Collector of Internal Revenue, v. Bacon,* 282 U. S. 122; *Bender, Collector of Internal Revenue, v. Pfaff,* 282 U. S. 127, and *United States v. Malcolm,* 282 U. S. 792) it was held by the Supreme Court of the United States that according to the laws of the States with which those cases were respectively concerned the wife had a vested property interest in the community property and not merely an expectancy, and therefore, *for tax purposes,* the spouses were allowed under the federal income tax law to make returns, each of one-half of their combined incomes. But in the *Seaborn* case it was pointed out that, under the Washington law there involved, the husband could not discharge his separate obligations out of community property, that the wife could prevent his making substantial gifts out of the community property without her consent, and that, under the rulings of the Wash-

ington courts, the community property was just as much the property of the wife as of the husband. So in the *Koch* case, involving the Arizona law, it was pointed out that in that State the husband could not act in fraud of his wife's rights, and, if he attempted to do so, she had a remedy in the courts. In the *Bacon* case, concerned with the community property law of Texas, it was stated that there also the wife was not without remedy in the courts if the husband acted in fraud of her rights. In the *Pfaff* case, it was said that in Louisiana, the law of which State was there under consideration, the limitations upon the exercise of the husband's power over community property were more stringent than in many others of the States having a community system. In the *Malcolm* case, dealing with the law of California, it was conceded that under the law of that State the wife had such rights and such access to appropriate judicial remedies for her protection while the marital relation still continued as to give her a one-half interest in the community income; this conclusion was based upon amendments of the California statutes made after a contrary decision had been rendered in *United States v. Robbins,* 269 U. S. 315. From the opinions in these cases it would appear, therefore, that in none of the States whose laws were thus appraised were all the factors present which exist in the Pennsylvania Community Property Law as herein previously discussed.

This court is therefore unanimously of opinion that the Community Property Law is wholly invalid, from which it follows that the payment of the premium by Mr. Lewis in this case was made entirely out of his own property, without any right, title or interest therein of Mrs. Lewis. Accordingly it is decreed that plaintiff is entitled to have the assignment of the policy to him approved by defendant Company and to obtain from the latter all the rights thereunto pertaining. Each party in this litigation to pay his, her or its own costs.